1          **UNITED STATES DISTRICT COURT**

2      **CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION**

3        **HONORABLE CORMAC J. CARNEY, U.S. DISTRICT JUDGE**

4

BRIAN HENDRICKS, ANDREW                    )
5   SAGALONGOS; on behalf of                   )
   themselves and all others                   )    **Certified Transcript**
6   similarly situated,                        )
                                               )
7                    Plaintiffs,               )
                                               )    Case No.
8          vs.                                 )    2:19-cv-6840-CJC-MRW
                                               )
9   AETNA LIFE INSURANCE COMPANY,              )
                                               )
10                   Defendant.                )
   _____)

11

12

13

14            REPORTER'S TRANSCRIPT OF PROCEEDINGS
                       MOTION HEARING
15          **REPORTED VIA ZOOM VIDEOCONFERENCE**
                   FRIDAY, MAY 7, 2021
16                     9:05 A.M.
                  SANTA ANA, CALIFORNIA
17

18

19

20

21

22   _____

23           **DEBBIE HINO-SPAAN, CSR 7953, CRR**
             FEDERAL OFFICIAL COURT REPORTER
24          411 WEST 4TH STREET, ROOM 1-053
                 SANTA ANA, CA 92701
25                dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

1              **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFFS:**

4          GIANELLI & MORRIS ALC
           BY:  ROBERT GIANELLI, ESQ.
5               JOSHUA SETH DAVIS, ESQ.
           550 South Hope Street
6          Suite 1645
           Los Angeles, California 90071
7          213-489-1600
           rob.gianelli@gmlawyers.com
8
   **FOR THE DEFENDANT:**
9
           MANATT PHELPS & PHILLIPS LLP
10         BY:  JOSEPH E. LASKA III, ESQ.
                NATHANIEL ADAMS COHEN, ESQ.
11         One Embarcadero Center
           30th Floor
12         San Francisco, California 94111
           415-291-7400
13         jlaska@manatt.com

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

|   | |
|---|---|
| 1 | **SANTA ANA, CALIFORNIA; FRIDAY, MAY 7, 2021** |
| 2 | **9:05 A.M.** |
| 3 | **- - -** |
| 4 | |
| 09:05AM 5 | THE COURTROOM DEPUTY:  Calling Item Number 1, |
| 6 | CV 19-6840-CJC, *Brian Hendricks vs. Aetna Life Insurance* |
| 7 | *Company.* |
| 8 | Counsel, I'll state your names for the record.  If |
| 9 | you'll respond in the affirmative. |
| 09:05AM 10 | For the plaintiff, Joshua Davis. |
| 11 | MR. DAVIS:  Yes, Your Honor. |
| 12 | THE COURTROOM DEPUTY:  Robert Gianelli. |
| 13 | MR. GIANELLI:  Present. |
| 14 | THE COURTROOM DEPUTY:  For the defense, Joseph |
| 09:05AM 15 | Laska. |
| 16 | MR. LASKA:  Yes.  Good morning, Your Honor. |
| 17 | THE COURTROOM DEPUTY:  Nathaniel Cohen. |
| 18 | MR. COHEN:  Good morning, Your Honor. |
| 19 | THE COURTROOM DEPUTY:  Thank you. |
| 09:05AM 20 | THE COURT:  Good morning, again, to everyone. |
| 21 | Well, before me is the plaintiff's motion to certify |
| 22 | the class.  Cheryl has indicated to me that she did give you |
| 23 | a -- or e-mailed a copy of the tentative that I thought would |
| 24 | be helpful for you to kind of understand what my current |
| 09:06AM 25 | thinking is and allow you to make the appropriate arguments. |

```
 1    Obviously, the tentative is in favor of the plaintiffs.  But it
 2    is the plaintiff's motion, so why don't I hear from the
 3    plaintiffs first.
 4          Mr. Davis or Mr. Gianelli, who's going to take the
 5    lead?
 6          MR. GIANELLI:  I will, Your Honor, Rob Gianelli.
 7    And thank you for the detailed tentative.  It's very helpful.
 8          So I can't say we disagree with almost anything
 9    that's in here given the findings that the Court has made
10    tentatively.  But we do have some concern and take issue with
11    the reference in the typicality section about the -- limiting
12    the evidence to the administrative record.  And the reason I
13    say that is that in a case like this -- first of all, there's a
14    big question of what the administrative record is.  Because as
15    you are aware, this isn't the typical ERISA claim.
16          For instance, we have a disability policy and a
17    claim that submits employment information, medical information.
18    And there's a decision made, and then the employee makes some
19    extra medical information, and then there's an appeal decision
20    made.  And then you have a record of what was considered and
21    decided as a factual matter.  This whole case is about a
22    preexisting position taken by the company decided upon and made
23    up by others at a different place in time.  It has nothing to
24    do with what any plaintiff submitted on his or her claim other
25    than they were seeking coverage for lumbar artificial disc
```

09:06AM (line 5)
09:06AM (line 10)
09:07AM (line 15)
09:07AM (line 20)
09:07AM (line 25)

1    replacement.

2           So there is no, quote/unquote, "true administrative

3    record" with anybody who's been denied this surgery pursuant to

4    this Clinical Policy Bulletin Notice 591.  The company, years

09:08AM  5    ago, made a decision -- and actually, we go back even farther.

6    Originally, they covered the surgery, and then when they merged

7    with the smaller company, they did a financial analysis and

8    decided to not cover it anymore, which is kind of an

9    interesting proposition when the question is whether the device

09:08AM 10    is safe and effective.

11           But in any event, for the last eight years they

12    covered this pursuant to a decision made way back when -- maybe

13    it's updated from time to time, maybe it's not -- but people at

14    a completely different department of the company whose job it

09:08AM 15    is to review medical literature and then come up with a

16    companywide policy that is formulated into this policy

17    bulletin, you know, purportedly on a review of clinical studies

18    and peer-reviewed articles, they've come up with a position.

19           And then when Mr. Hendricks and Mr. Sagalongos comes

09:09AM 20    along, someone says, "Okay.  They want this surgery.  Here's

21    the decision someone else made at a different point in time

22    pursuant to a different process, and we're just going to apply

23    it because that's what we do."

24           So it doesn't have the give and take of what you

09:09AM 25    would see or expect in the typical administrative record.  So

UNITED STATES DISTRICT COURT

that's an issue.  And the Court's going to be called upon in

this case to decide whether that review of the scientific

literature is correct or not.  And I don't know what the

defense is going to say about what the administrative record is

09:09AM in the case of this nature, but I would say that it's going to

be very difficult for the Court to say, "Well, here's a bunch

of medical articles they put in a position paper, and it's

right, wrong, or reasonably right or wrong, but there's no

foundation.  You're going to need experts."  There's a whole

09:10AM host of things that are going to go into this ability to make a

decision on the really narrow issue in this case.

            And again, it's a question of whether the scientific

literature, based on clinical trials, shows that this is safe

and effective.  So -- and then there are going to be questions

09:10AM about, you know, whether the so-called administrative record

issue is excused under various theories.  They didn't comply

with the ERISA claim procedures and other issues.

            So while we don't have a problem, conceptually, of

limiting this class to an abusive discretion class -- that's

09:10AM the vast majority of these people anyway -- we do, you know,

have an issue as to what that means in terms of the,

quote/unquote, "administrative record."

            THE COURT:  I understand what you're saying.  And

I'm not sure I want to challenge you on it other than do you

09:11AM see this standard of review being different?  Let me expand on

1    that a little bit because I don't feel my question is clear

2    enough to you.  I take from what you said is, "Judge, you're

3    going to have to determine whether Aetna's policy of this type

4    of surgery being experimental or investigative is reasonable

09:11AM 5    based on the scientific literature."  And I get that.

6           And so, I don't know, I'm speculating what the

7    administrative record looks like for the individual-named

8    plaintiffs, but I assume that it is not a robust record on the

9    scientific literature and what the decision makers considered

09:12AM 10   when they reached the decision on this policy.  But I did see

11   the denial letters where they say, "We denied it because of

12   this policy."

13          So my question is, you're saying I'm going to have

14   to look at probably evidence beyond the administrative record.

09:12AM 15   I get that.  But is it going to impact the standard of review

16   whether there was an abuse of discretion or a de novo review?

17          MR. GIANELLI:  No.  I don't think that -- whatever

18   the body of evidence you look at for this narrow question to

19   resolve this case, I don't think the standard of review is

09:13AM 20   going to make any difference.  You know, whether they -- the

21   science shows that this is wrong or unreasonably wrong under

22   some type of skepticism -- you can slice this as thin as you

23   want, but, you know -- I just don't think it's going to come

24   down to a really narrow scope such as that.

09:13AM 25          THE COURT:  Okay.  So I'm looking at the tentative,

         1    and I'm looking at the typicality section, and I'm trying to

         2    think out loud, which is always a dangerous thing on my part,

         3    the specific language that you find concerning --

         4              MR. GIANELLI:  So, yes --

09:13AM  5              THE COURT:  I'm characterizing it.

         6              MR. GIANELLI:  -- on, page 9, the first full

         7    paragraph, second sentence, "Consequently, they are limited to

         8    the evidence..."

         9              THE COURT:  I see.

09:14AM 10              MR. GIANELLI:  Yeah.  And this creates problems for

        11    the defense, too, because, you know, they have to -- they're

        12    going to say, "Well, here's the Clinical Policy Bulletin.

        13    That's it.  That's all we have."  I mean, you know, being

        14    hypertechnical about it, this document is not in a given

09:14AM 15    person's file.  It's mentioned, but it's, you know, somewhere

        16    in their database somewhere.  So are they going to then be

        17    allowed to say, "Well, look, we referenced it, so it's good"?

        18              And then are we going to say, "Well, okay,

        19    Dr. Jackson, a noted spine surgeon, he submitted a request for

09:14AM 20    this."  And so when he submits a request for this, it's within

        21    his understanding that all the appropriate medical literature

        22    that he is aware of should come into play.  I mean, you can go

        23    out as far as you want on that.

        24              But at the end of the day, like I said, this comes

09:15AM 25    down to the narrow question in this case, is what does the -- a

1    true and accurate review of the medical literature reveal?

2    And, obviously, we're very secure in that position because this

3    thing was FDA approved, two different devices years ago, and

4    there have been numerous studies.  And one of the problems we

09:15AM 5    have, obviously, with this Clinical Policy Bulletin is that it

6    omits articles or it mischaracterizes them.  There is a reason

7    that every other major health plan in the country covers this

8    surgery and this one doesn't.

9         And this bleeds over into the breech of fiduciary

09:15AM 10    claim because -- because of this, what we say, is the use of an

11    improper standard.  And there is no administrative record.

12    There is no abuse of discretion under the breach of fiduciary

13    duty claim.  So we just don't want to be limited or locked in

14    to the notion that there is -- there is even an administrative

09:16AM 15    record that exists and that would be in a case of this nature.

16         As I said, conceptually, we don't have a problem

17    with the Court certifying only the abuse of discretion class.

18    I mean, we think given this is really -- there is only one set

19    of proof that the Court's going to see, and that is the body

09:16AM 20    medical literature that applies.  But I think you're going to

21    have to hear expert testimony in this case.  And I don't know

22    if the defense thinks it's going to proceed without that, but

23    there's just no way to know whether you're getting the full

24    story, the correct story, on what is the full body of medical

09:16AM 25    literature and so forth until you get that kind of testimony

1   before you.

2          THE COURT:  I understand.  And like you, I think,

3   mentioned earlier, defense may be pretty adamant that they want

4   me to consider the evidence -- the medical literature that went

09:17AM  5   into the decision that this surgery is experimental or

6   investigative.

7          I don't have the specific wording of these two

8   different standards before me, and I -- but tell me what is

9   the -- what does the abuse of discretion standard or review

09:17AM 10   mean, and what does the de novo review --

11          MR. GIANELLI:  Sure.

12          THE COURT:  -- standard review?

13          And then, obviously, in the typical ERISA cases, if

14   it's de novo, you're limited -- I mean, if it's abuse of

09:17AM 15   discretion, you're limited to the administrative record.  If

16   it's de novo, you can consider everything.

17          And I take it, Mr. Gianelli, you're saying, "Judge,

18   we don't have a problem with you limiting yourself to the

19   standard of review, but not -- we're troubled by the component

09:18AM 20   where you apply that standard of review just to an

21   administrative record, because you're going to have to look at

22   stuff beyond the administrative record."  That's what I'm

23   understanding.

24          MR. GIANELLI:  That is true.  But, also, in the

09:18AM 25   first instance, there is a question of what is the

1    administrative record in the case of this nature.

2            THE COURT:  Okay.  But I think you were about ready

3    to help me out.  Give me the -- what is de novo standard review

4    and what is an abuse of discretion standard review?

09:18AM 5            MR. GIANELLI:  Let's assume, for the moment, we're

6    dealing with a fixed body of evidence.  The record's already

7    in.  You've heard the evidence.  Under de novo, the question

8    would be "Is Aetna's position right or wrong?"  Under abuse of

9    discretion, there is a reasonableness element injected into it,

09:19AM 10   but that is tempered by a degree of skepticism that is applied

11   given the company's admitted interest -- financial interest in,

12   you know, not covering claims.

13           THE COURT:  Got you.  Okay.

14           Why don't I hear from the defense, and then I'll

09:19AM 15   give you another opportunity to respond, Mr. Gianelli.

16           MR. LASKA:  Thank you, Your Honor.  This is Joe

17   Laska for Defendant Aetna.  And I, too, want to start out by

18   thanking the Court for the tentative ruling.  It was very

19   helpful in preparing for today and focusing the arguments.

09:19AM 20           So I think the Court's tentative, as to the point

21   that Mr. Gianelli raised on the scope of the administrative

22   record, I think the Court's tentative ruling correctly states

23   ERISA law.

24           I also note that there is a pretty well-established

09:20AM 25   body of law governing how administrative records can be

```
        1    supplemented into certain examples -- in certain circumstances,
        2    for example, where the Court may find expert testimony useful.
        3    And I would submit to the Court that if the Court decides to
        4    certify a class -- obviously, I hope to change the Court's mind
09:20AM 5    this morning, but if the Court decides to stick with the
        6    tentative and certify a class, then that's an issue that could
        7    be decided or fleshed out a little bit later
        8    post-certification.  It certainly would affect the issue on the
        9    standard of review.
09:20AM 10           But it won't surprise the Court that I would like to
        11   focus this morning on some other issues in the tentative.  And
        12   I'd like to begin with the issue of exhaustion.  So on page 10
        13   of the tentative, the Court had tentatively found that -- this
        14   is starting at line 24 that, essentially, plaintiffs were not
09:21AM 15   required to pursue two levels of appeal before filing suit.
        16   And the Court said because Aetna's plan documents can be fairly
        17   read as suggesting that exhaustion of the second-level appeal
        18   is not mandatory, plaintiffs were not required to exhaust their
        19   second-level appeal before filing that suit.
09:21AM 20           Your Honor, we believe that plaintiff's plans state
        21   about as clearly as they can, that members are generally
        22   required to exhaust all of the plans' appeal processes before
        23   bringing an action in litigation.  In fact, that's almost
        24   exactly what the plans say.  They say under a bolded heading
09:21AM 25   that reads "Exhaustion of internal appeals process," the plans
```

1    say -- this is a quote:

2            "Generally, you are required to complete all

3        appeal processes of the plan before being able to

4        obtain external review or bring an action in

09:21AM 5    litigation."

6            Now what about this term "generally"?  Well, the

7    next sentence explains that there is one exception, and it's

8    where Aetna does not adhere to ERISA claims processing

9    required.  And as we explained, that's not the case here.

09:22AM 10           Now the tentative points to language.  It's saying

11   that a member dissatisfied -- language elsewhere in the

12   provision that a member dissatisfied with the outcome of the

13   first-level appeal may submit a second-level appeal, and

14   focuses on the notion that this word "may" is permissive.

09:22AM 15   Well, in that context, of course the provision says that.  A

16   dissatisfied member is not required to submit another appeal.

17           The member may accept a decision and decide to

18   either not get the surgery as Mr. Sagalongos did here or to pay

19   for the surgery himself, which is what Mr. Hendricks decided to

09:22AM 20   do here.  As the plan says, a member is only required to file a

21   second-level appeal if he is going to bring a legal action.

22           The Court also points to language in a document

23   that's not a plan document, but it's an attachment to the

24   denial letters and appeal letters that are sent to the

09:23AM 25   plaintiffs about when the decision is considered final.  And

UNITED STATES DISTRICT COURT

1   while I can see the Court's point here, I have to note first

2   two things:  First this letter that goes out, this attachment

3   to the letters is not itself planned language.  And if the

4   Court finds that it conflicts with the language of the plan,

09:23AM  5   which clearly it says that exhaustion is required, then it's

6   the plan language that has to control.

7          And secondly, there is -- and I think this is

8   important here -- there's no evidence that the plaintiffs

9   themselves were actually confused by any of this.  Plaintiffs

09:23AM 10   have gone to the trouble of submitting declarations in support

11   of their motion.  And if the plaintiffs were confused by the

12   appeal documents or were led to believe that they were required

13   to exhaust administrative remedies, it would have been very

14   easy for them to add a sentence saying that in their sworn

09:24AM 15   declaration, and they didn't do that.  So there's no evidence

16   before the Court that plaintiffs were actually misled about

17   this.

18          So I'd like to transition, then, Your Honor, to the

19   issue of commonality, because exhaustion is also an issue when

09:24AM 20   it comes to commonality.  And unless I misstate, Your Honor, I

21   did not see this argument that we raised addressed in the

22   tentative.  Because -- so we argued in opposition that this

23   issue of exhaustion also destroys commonality because it's an

24   individualized issue that must be determined as to each class

09:24AM 25   member.  And plaintiffs argue on reply that courts in this

Circuit apply a vicarious exhaustion rule.  And so if the
plaintiffs have exhausted their administrative remedies, then
that's sufficient to permit a class action.

Now, this argument by plaintiffs about courts, given
this Circuit, is a little misleading because plaintiffs like to
know Ninth Circuit authority saying this, and we're not aware
of any.  And so they cite to several nonbinding district court
opinions, all of which are distinguishable for one reason or
another.

But the real problem is that this notion of
vicarious exhaustion runs smack into the Rules Enabling Act,
which says that procedural rules can abridge substantive
rights.  So here the procedural rule in question is Rule 23,
which allows people to join their claims together as class
actions under certain circumstances.  And the substantive right
in question is the right of an ERISA plan to have a member
exhaust remedies that are required by the plan documents itself
before seeking a relief in federal court.

And in the *Dukes* case, the Supreme Court recognized
that Rule 23 can't be applied to abridge a party's substantive
right to a defense.  And that means in this context that a
member who hasn't exhausted the appeal process required by his
or her plan can't avoid that requirement by joining forces with
a class representative who has exhausted the appeal process.
And it's really that simple.

1       Plaintiffs do not address this Rules Enabling Act

2  issue at all in their reply brief.  And again, Your Honor, we

3  didn't it addressed in the tentative.  So I would ask, if

4  nothing else, that the Court take a look at that issue because

09:26AM 5  we really think that's important.

6       Finally, Your Honor, the issue of commonality, the

7  Court has recognized, I think, in its tentative, that there is

8  a number of exceptions and instances where Aetna has covered

9  L-ADR, but then the tentative goes on to say that that doesn't

09:26AM 10  destroy commonality because the evidence shows that Aetna's

11  policy is to deny coverage for lumbar ADR because it is

12  experimental and investigational.

13       Respectfully, Your Honor, that's not quite what the

14  evidence shows.  The evidence shows that in every case, Aetna

09:27AM 15  medical directors, who are physicians in good standing review

16  all of the claims, review all of the medical records, look at a

17  number of materials, including Aetna's Clinical Policy

18  Bulletin, and make an individualized decision based on the

19  member.

09:27AM 20       Now, in many instances, the requests are denied as

21  we would expect given Aetna's coverage guidelines.  But not all

22  requests are denied; some are approved.

23       Now the Court also says that it's present of

24  approvals.  And we know that these are not mistakes.  We know

09:27AM 25  that these are real approvals because plaintiffs opposed

```
 1   medical directors who made the decision, who explained that
 2   they did it and why.  And, of course, this doesn't prevent a
 3   finding of commonality because the class is limited to denials.
 4   Well, here's why that doesn't work in a case like this where
 5   the plaintiffs are trying to certify the class under 23(b)(1)
 6   or (b)(2) as opposed to (b)(3).
 7           Plaintiffs have been very clear about the practice
 8   that they are seeking to enjoin.  In their Complaint they
 9   say -- and I'm quoting from the Complaint here, Third Amended
10   Complaint, paragraph 18:
11           "Pursuant to CPB, Aetna has denied all
12       requests for L-ADR on the basis that L-ADR is
13       experimental and investigational.  Aetna denies
14       coverage for L-ADR regardless of the member's
15       medical profile or need."
16           Now plaintiff's motion for class certification says
17   exactly the same thing, that -- here I'm quoting from their
18   motion at page 15:
19           "The common question plaintiffs are trying to
20       adjudicate is 'that it arises out of Aetna's
21       practice of denying all requests for L-ADR as an
22       experimental and investigational in all
23       circumstances."
24           Now, in the Rule 23(b)(1) and (b)(2) context,
25   plaintiffs are trying to certify a class under these rules
```

**UNITED STATES DISTRICT COURT**

 1   because of the comparatively looser certification standards

 2   compared to, say, 23(b)(3).  But to do that, they're required

 3   to show that this practice that they're trying to enjoin

 4   exists.  And the evidence on this motion shows that this

09:29AM 5   practice of denying all requests for L-ADR, the experimental

 6   and investigational, simply doesn't exist.  And if Aetna was

 7   going to do that, it wouldn't need a licensed physician to

 8   review every request in each member's records.

 9           Now, if plaintiffs -- so essentially, what that

09:30AM 10   means, Your Honor, is that because plaintiffs were unable to

 11   prove this common uniform practice as to everyone, they're now

 12   essentially arguing that, well, so maybe Aetna doesn't always

 13   deny L-ADR, but when it does, it does so wrongfully.  Well,

 14   that type of claim would need to be certified under

09:30AM 15   Rule 23(b)(3).  But that's not what they tried to do here,

 16   Your Honor.

 17           And I will also -- just to compare this to another

 18   L-ADR case that was litigated, *Escalante*.  In the *Escalante*

 19   case, the Court found that there was a uniform practice.

09:30AM 20   Because in that case, it was undisputed that Blue Shield had

 21   denied all requests for L-ADR as experimental and

 22   investigational.  And so the Court found there was a common

 23   question and that the Court -- the class could be certified

 24   under (b)(1) and (b)(2), and that's simply not the case here.

09:31AM 25           When the Court is looking whether to certify a class

**UNITED STATES DISTRICT COURT**

1    to challenge an allegedly uniform practice, the Court can

2    examine a subset of those subject to the policy who happened to

3    have been harmed by it.  The Court has to look at everyone who

4    is subject to the practice, which here would be everyone who

09:31AM 5    sought L-ADR from Aetna.  And there's no commonality among that

6    group.

7              Your Honor, I've been talking for a little bit, so

8    I'll pause there to see if the Court has any questions.

9              THE COURT:  I do have a few, but you've been very

09:31AM 10   helpful.  The concern I have -- question I have about your

11   position on commonality is when I look at the denial letters,

12   they say "We're dying because of the policy, that this is

13   experimental and investigative."  And there's no other reasons

14   or factors that I see in these denial letters.  And so I'm not

09:32AM 15   challenging you that there have been certain medical directors

16   or certain patients that have been given this surgery and

17   Aetna's covered for it, but it seems at least the class

18   representatives, it was "You're not getting this because of

19   this policy.  It's not covered."

09:32AM 20             So I'm having a problem then -- I assume that

21   anybody who's going to be part of this class is going to have a

22   very similar denial letter, and that's not difficult to

23   determine.  You just look at the denial letters, was it denied

24   based on being experimental and investigative?  And if so,

09:33AM 25   you're part of the class.  I'm not -- I'm having problems with

your argument is that there's not a uniform policy here when

what's before me, the class representatives have a denial based

on a policy.

MR. LASKA:  Right, Your Honor.  But I think the

point here that we've made is that -- and I think we've shown

through the evidence is that that policy -- it may be that --

actually, I will say, first of all, that I don't know that the

Court -- that the plaintiff had carried their burden to show

that every single denial was on this basis.  I don't think we

have every single denial letter, you know, in the record.  And

I don't know that that -- that has been sufficiently proven.

But I will say that the larger point, from our

perspective, is that it's not just limited to people who have

denials.  It's that plaintiff -- again, the practice that

they're seeking to enjoin is the practice of Aetna denying all

requests for L-ADR on this ground.  And that is -- that's

simply not true.

As the evidence has shown, Aetna sometimes approves

these requests for various reasons.  And Aetna, other times,

maybe even a majority of the times denied these requests.  And

when it does so, you know, maybe it does so mostly or entirely

for reasons related to the medical policy, which is what we

would expect.  But that this -- the point, then, is that when

Aetna is denying these individual requests after individualized

review, plaintiff's claim is, well, it's doing so wrongfully in

1    every case.  And that's no longer a (b)(1) or a (b)(2) case.

2    That's something where you actually have to look at the

3    individual facts.

4         THE COURT:  All right.  Mr. Gianelli, you want to

09:35AM 5    respond?

6         MR. GIANELLI:  On that particular point, Your Honor,

7    or all of them?

8         THE COURT:  I'd say in all of them.

9         MR. GIANELLI:  All right.

09:35AM 10        THE COURT:  Which I'm trying to make it easy because

11   I think there's an overlap.  There's the exhaustion and -- on

12   its own, but then as it relates to commonality.  And then the

13   second argument about commonality is there's not a uniform

14   policy, it's individualized decision.

09:35AM 15        MR. GIANELLI:  Okay.  And if I may, let me just

16   point out -- it sounds like Mr. Laska is -- the position on the

17   administrative record is, you know, not firm as some of the

18   language in the tentative is, and that he realizes that may

19   mean it's not a strict sort of traditional administrative

09:36AM 20   record issue we're dealing with.  And if that's the case, then

21   that's fine.

22        So let me move on to the exhaustion issue.  As the

23   Court correctly noted, the language in both the plan and in the

24   letter that they send out is filled with all these "may" words

09:36AM 25   and does not communicate to the average person in a clear

1    fashion that you must do these things or you waive your right

2    to proceed in court.

3              As Judge Alsup said recently in a similar case -- we

4    had the same issue in the second-level appeal, and it was a

09:36AM 5    similar type -- he just said, "Look, if you're going to tell

6    somebody they didn't do something so they can't sue in court,

7    spell it out clearly, 'You must do this or...'  don't have a

8    lot of 'may' language sprinkled in with other language, and

9    then language like 'Generally speaking, this may happen'

09:37AM 10   because it's not clear."

11             But well beyond that, they tell people -- so each of

12   these plaintiffs, Mr. Sagalongos and Mr. Hendricks, was told on

13   three occasions, "We don't cover this.  It's not safe and

14   effective."  And their position here is, "Well, the fourth

09:37AM 15   time -- you should have tried a fourth time because three or

16   four percent of the times our medical directors will make an

17   exception -- or have made an exception."

18             The glaring problem there is that this exception is

19   secret, if it, indeed, was an exception.  We don't think it's

09:37AM 20   an incredible reading of the evidence.  We think these are

21   serious mistakes.  You've got a company, like, the second or

22   third largest health insurance company in the country.  They've

23   got these people spread out all over the country.  They're

24   dealing with hundreds of claims a week.  Do they make mistakes?

09:38AM 25   You bet.  Do they pay fines when the company guidelines said,

1   "Don't pay this.  It's not safe and effective"?  Yes.

2        Does it make any sense that someone would say "The

3   company has spent all this time and research determining if

4   this is not safe and effective for anyone in any circumstance,

09:38AM  5   but, you know, today is a Tuesday, and I'm feeling pretty good.

6   So I'm going to pay this guy's claim."  It's just not credible.

7   It doesn't make any sense.  It violates the claim procedures

8   about treating similarly situated claims the same way.

9        Even if we accept the proposition that, yes, they

09:38AM 10   did make exceptions, well, you didn't tell anybody about it.

11   How would anybody expect that they could be the lucky one in

12   the lottery, three, four percent of these claims, and get their

13   claim paid and don't do anything about it when you don't tell

14   anybody it was an exception and you don't give them the

09:39AM 15   criteria for it?  Because there aren't any.  The Court has seen

16   no document that sets this forth as a policy or procedure

17   anywhere.

18        The CPB says experimental and investigational are

19   all considerations.  It doesn't say, "You know, we may make an

09:39AM 20   exception."  There's no document that says that.  So what has

21   happened here is the lawyers have gone and they found the

22   mistakes.  You know, they found these three percent of the

23   mistakes where they authorized the claims and they fashioned

24   this argument that this is a discretion and exception.  But

09:39AM 25   that's not written anywhere.  It's a lawyer argument.  That's

all it is.  So there was no reasonable belief on either of the

plaintiffs' part that appealing -- asking for a fourth

consideration of this opinion that says "We never cover it"

would make any difference.

09:40AM 5          So I just -- the exhaustion thing is -- it's not

even a close call in our view.  So let me talk about the

commonality.  Much of this spills over as you indicated in the

commonality argument.  I think Aetna has admitted by virtue of

the -- that these are exceptions.  They say these physicians

09:40AM 10 can make exceptions, but that's a practice.  If you say it's an

exception, it's an exception from what?  It's an exception from

what you normally do.  That is what a practice is.

13          The fact that these are three or four percent of the

times these things get paid, it just shows you, well, okay, so

09:40AM 15 you have a series of one-offs.  What does that means?  Does

that mean that the people who are denied 97 percent of the time

pursuant to this guideline that they don't have a practice that

can be addressed?  Of course not.  That's why you have class

actions.

09:40AM 20          If, in fact, under Aetna's analysis, if one person

got paid, you could defeat every class action by saying, "You

know what, claims person?  Find one claim and we'll pay that,

and then they'll never be able to show we had a practice.

Because the thousands of others we denied, well, it's not a

09:41AM 25 practice because we paid one."  That doesn't disprove a

practice.

There is overwhelming evidence in this case of a practice. There is a directive of -- coverage directive that says "We don't cover this" that allegedly was a result of all this research they did. Saying something is not safe and effective is not like saying, "Well, you know, maybe we'll cover something because this person seemed really sick." That's not what that is. It's a black-and-white decision.

And then you direct your people to follow this. All the witnesses said, "Yes, we're supposed to follow this guideline when a lumbar artificial disc replacement claim comes in. And, yes, we did follow it."

What a couple of them said is, "Well, you know, if there is a life-threatening situation, we can make an exception if we go to the medical committee on that." That didn't happen here. And that doesn't happen with lumbar ADR. It is not a life-threatening surgery. It doesn't address people with advance cancer and things of that nature.

So I don't think there's any credibility to the so-called exception issue. And it certainly doesn't ever undermine the notion that there's a practice at issue here that can be addressed by a court determining whether this company's position on lumbar ADR is correct or not.

THE COURT: All right. Mr. Laska, I'll give you a brief rebuttal.

1          MR. LASKA:  Thank you, Your Honor.  I appreciate

2     that and I will try to be brief.

3          I don't want to repeat myself so I'll just say

4     Mr. Gianelli, again, like in the reply brief on the issue of

09:42AM 5     exhaustion, refers to the -- the language "may" used in

6     different parts of the -- of the appeals processes.  I read to

7     the Court this morning the sentences saying that "You are

8     required to complete all levels of appeal in this document

9     before bringing an action in court."  I don't know how the plan

09:43AM 10     could say that any more clearly than it already does.

11          Also, plaintiff -- Mr. Gianelli said several times

12     about how the plaintiffs in this case, the class

13     representatives, have already gone through three levels of

14     review.  And that's a new argument that they raised for the

09:43AM 15     first time on reply based on the notion that a peer-to-peer

16     review, which is a conversation between one of Aetna's

17     reviewers and the surgeon, is a separate level of review.

18     That's a new thing that was just raised in reply.  That's not

19     what the law holds.  That's not what ERISA regulations hold.

09:43AM 20     It doesn't make any sense in practice.

21          A peer to peer is part of one of these reviews that

22     is done either by the initial reviewer or by one of the appeal

23     reviewers as part of that process.  So it's maybe not the

24     biggest point in this argument today, but I just wanted to

09:44AM 25     point out to the Court that that's a little bit of misdirection

1    here.  It's not really three levels of review.  Each plaintiff

2    went through an initial denial and a first-level appeal.  And

3    as we all -- as is undisputed, they did not do a second level

4    of appeal.

09:44AM  5         On the issue of commonality, and counsel's arguments

6    that the notion that medical directors are exercising

7    discretion and are deciding to cover L-ADR is not credible and

8    that there's no evidence of it.  It may be that there's no

9    written document listing exceptions to L-ADR, but it is also

09:44AM 10   the truth that every single Aetna witness, not only Aetna's

11   30(b)(6) witness, but also every single medical director that

12   the plaintiffs themselves asked to depose who are all of the

13   reviewers for all of the plaintiffs testified, one, that they

14   conducted individualized review, and that even when -- even in

09:45AM 15   the case of a procedure that is considered experimental and

16   investigational, under which Mr. Gianelli's theory you won't

17   even have to review anything, you can just look at the code and

18   see that it's experimental and deny it.

19        They testified that they review all medical records

09:45AM 20   for the member and conducted an individualized review.  Every

21   single witness testified that they can and, in some cases, do

22   make exceptions to Clinical Policy Bulletins saying that

23   certain procedures are experimental and investigational when

24   they believe that there's some reason that it should

09:45AM 25   nonetheless be covered.

**UNITED STATES DISTRICT COURT**

1    And certain medical directors testified that they
2  did this specifically with respect to L-ADR.  Dr. Jacobson, who
3  reviewed Mr. Sagalongos claim, specifically did this as to
4  another member.
09:46AM 5    And Mr. Gianelli's response and counsel's response
6  in reply is, "Well, this just lacks credibility."  And if the
7  suggestion is that a half-dozen or more licensed medical
8  directors in good standing are all lying under oath or were,
9  you know, coached to lie under oath by counsel in this case
09:46AM 10 and -- you know, I'll save my umbrage, but I'll just assure the
11 Court that that is not true.  And that kind of speculation is
12 not satisfying plaintiffs' burden to show a common practice.
13    And finally, Your Honor, as to this --
14 Mr. Gianelli's argument that one claims -- if the Court were to
09:46AM 15 accept our theory one claims payment in any case could defeat
16 class certification, that's not really true.  And, in fact,
17 that's exactly what happened in the *Hill* case, which is another
18 L-ADR case that was litigated by plaintiffs' counsel.
19    In that case, United argued to the Court that there
09:47AM 20 had been some claim payments and it showed the Court evidence
21 of that.  But it was unable to explain to the Court, at least
22 to the Court's satisfaction, that there was any reason why
23 these were approved, that this was, essentially, anything other
24 than a mistake.  And as a result in that case, Judge Carter
09:47AM 25 decided that that wasn't enough to show the absence of the

1    common practice.  And he certified the class.

2            That's not the case here.  The case here is we have

3    clear evidence.  Not only contemporaneous written reviews of

4    precertification requests, but also sworn testimony under oath

09:47AM 5    from the medical director by Dr. Jacobson testified about their

6    individualized review and their decisions to approval L-ADR for

7    certain individuals.  It's totally distinguishable from *Hill*,

8    and the Court need not accept that sort of, you know, doomsday

9    suggestion, that sort of slippery slope argument to deny

09:48AM 10    certification in this case.

11            And I promised the Court I would be brief, and I'll

12    end it, Your Honor.

13            THE COURT:  I appreciate it.  I appreciate the

14    argument on both sides.  I'll take the matter under submission

09:48AM 15    and try to get a decision out next week.

16            MR. GIANELLI:  Thank you, Your Honor.

17            MR. LASKA:  Thank you, Your Honor.

18            THE COURTROOM DEPUTY:  Court is in recession.

19            **(Proceedings concluded at 9:48 a.m.)**

20                              **--oOo--**

21

22

23

24

25

```
 1                CERTIFICATE OF OFFICIAL REPORTER

 2

 3   COUNTY OF LOS ANGELES   )
                             )
 4   STATE OF CALIFORNIA     )

 5             I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

 6   COURT REPORTER, in and for the United States District Court for

 7   the Central District of California, do hereby certify that

 8   pursuant to Section 753, Title 28, United States Code that the

 9   foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   Date:  May 17, 2021

16

17

18

19                              /S/ DEBBIE HINO-SPAAN

20                              Debbie Hino-Spaan, CSR No. 7953
                                Federal Official Court Reporter
21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**